UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 09-20920-CIV-ALTONAGA/Brown

NASHOANE FULWOOD-KELLEY,
*et al.*,

       Plaintiffs,

vs.

CORDIS CORPORATION,

       Defendant.

_____/

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY

**THIS CAUSE** came before the Court upon Defendant, Cordis Corporation's Motion for Summary Judgment on the Issue of Liability ("Motion") [D.E. 35], filed November 2, 2009. Plaintiffs, Nashoane Fulwood-Kelley, Mabel Fombu, and Lissette Pendas, filed this suit on April 8, 2009, alleging Defendant, Cordis Corporation ("Cordis"), violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219, by failing to pay Plaintiffs overtime. (*See* Compl. [D.E. 1]). The only issue on summary judgment is whether Plaintiffs were exempt from the FLSA overtime requirements as administrative employees. The Court has considered the parties' written submissions and the applicable law.

## I.  BACKGROUND[1]

Cordis develops, manufactures, and distributes interventional medical devices; develops less invasive treatments for vascular diseases; and is a global leader in developing and manufacturing stents, catheters, and guidewires. (*See* Dep. of Lissette Pendas ("*Pendas Dep.*") [D.E. 40] 5:4–12

---

[1]  Unless otherwise noted, the facts in this section are undisputed.

CASE NO. 09-20920-CIV-ALTONAGA/Brown

(sealed document)).  Cordis operates in a heavily regulated industry.  (*See id.* 29:5–7).  The Food and

Drug Administration ("FDA") requires Cordis to have uniform procedures for receiving and

investigating complaints about its devices.  (*See* Dep. of Charles Goldberg ("*Goldberg Dep.*") [D.E.

48] 62:19–63:2 (sealed document)).  To satisfy this requirement, Cordis operates a Complaint

Handling and Safety Surveillance Department ("Complaint Handling Department").  (*See Pendas*

*Dep.* 5:13–23).  Cordis's employees must follow the Complaint Handling Department's procedures

and policies.  (*See Goldberg Dep.* 60:9–16, 111:8–18).  Since the Complaint Handling Department

enables Cordis to comply with domestic and international regulatory mandates, it is a critical part

of Cordis's operations.  (*See Pendas Dep.* 5:13–23).  If Cordis failed to properly comply with

regulatory requirements, it could be audited, prohibited from selling its products, or subject to suit.

(*See* Dep. of Nashoane Fulwood-Kelley ("*Fulwood-Kelley Dep.*") [D.E. 40] 111:18–112:6 (sealed

document)).

A.      **The Plaintiffs**

Plaintiffs worked as Complaint Handling Specialists ("Specialists") in Cordis's Complaint

Handling Department.  (*See id.* 13:9–24; *Pendas Dep.* 27:2–7; Dep. of Mabel Fombu ("*Fombu*

*Dep.*") [D.E. 40] 9:17–24 (sealed document)).  Specialists are responsible for maintaining and

ensuring company compliance with domestic and foreign regulations.  (*See Pendas Dep.* Exs. 35 &

52; *Fombu Dep.* 9:17–24).  More specifically, they represent Cordis in handling complaints, evaluate

product complaints, and are the "owners" of complaints through conclusion.  (*See Pendas Dep.*

40:5–17, Ex. 35).  Specialists do not work on the production line or engage in sales (*see id.*

28:25–29:4); rather, they often work from home (*see id.* 98:10–15).  Although Specialists are highly-

skilled employees (*see Goldberg Dep.* 89:10–19), Cordis does not require them to have degrees (*see*

2

CASE NO. 09-20920-CIV-ALTONAGA/Brown

*id.* 87:7–9).

Cordis employed Fulwood-Kelley as a Specialist from June 2002 through July 2009. (*See Fulwood-Kelley Dep.* 8:19–22). From 2006 through 2009, Cordis paid Fulwood-Kelley an annual salary, including bonuses, of \$94,000–\$103,000. (*See id.* 10:22–12:8; Decl. of Charles Goldberg ("*Goldberg Decl.*") [D.E. 35-1] ¶ 2). Fulwood-Kelley has a B.S. in healthcare administration and an M.S. in computer technology. (*See Fulwood-Kelley Dep.* 6:6–16). Before working at Cordis, Fulwood-Kelley credentialed physicians at a medical staff office. (*See id.* 6:17–7:7). She also worked at a heart hospital as a quality manager and a performance improvement coordinator. (*See id.* 7:8–13).

Cordis employed Fombu as a Specialist from August 2006 through May 2008. (*See Fombu Dep.* 5:4–12). Cordis paid Fombu an annual salary, including bonuses, of \$70,000–\$73,000. (*See id.* 9:2–16; *Goldberg Decl.* ¶ 3). Fombu is a registered nurse; she has a B.S.N. in nursing and a B.S. in political science and philosophy. (*See Fombu Dep.* 6:6–13). Before joining Cordis, Fombu worked as a registered nurse. (*See id.* 3:24–4:23, 6:20–23).

Cordis employed Pendas as a Specialist from January 2004 through October 2009. (*See Pendas Dep.* 6:15–22). Cordis paid Pendas an annual salary, including bonuses, of \$69,000–\$73,000. (*See id.* 27:15–28:18; *Goldberg Decl.* ¶ 4). Before working at Cordis, Pendas received a two-year x-ray technician certificate and worked as an x-ray technician. (*See Pendas Dep.* 5:24–6:14). At times, Pendas used her hospital experience to help her perform her job at Cordis. (*See id.* 85:16–86:5).

CASE NO. 09-20920-CIV-ALTONAGA/Brown

**B.      The Specialist's Job**

The Specialist's job comprises four basis components: (1) reviewing source data; (2) making reportability determinations; (3) investigating complaints; and (4) writing conclusions based on the investigations.  (*See id.* 8:22–9:22, Ex. 36).

### 1.      Reviewing Source Data

The Complaint Handling Department receives complaints about Cordis devices from many sources.  (*See id.* 14:4–9).  A complaint is any "written, electronic or oral communication that alleges sufficient deficiencies related to the identity, quality, durability and reliability, safety and effectiveness[,] or the performance of a device after it is released for distribution."  (*Id.* 84:3–11). Complaints are received by Associates, who are hourly employees.  (*See id.* 14:10–15:19).  The Associate creates a complaint file on Cordis's computer system and enters data related to the event, including the nature of the complaint, the device at issue, the location of the event, and the complainant's contact information.  (*See id.*; *Fombu Dep.* 12:24–13:12).

A Specialist then reviews the source data for the complaint.  (*See Pendas Dep.* 15:17–19, 16:4–8).  If the source data is incorrect or incomplete, the Specialist asks the complainant for additional information.  (*See Goldberg Decl.* ¶ 5).  For routine complaints, such as a failure-to-cross[2] or a kink/bent[3] complaint, the Associate processes the complaint.  (*See Goldberg Dep.* 31:4–25). For other types of complaints, the Specialist proceeds with her coding and reportability determinations.  (*See Goldberg Decl.* ¶ 6).

---

[2]  A failure-to-cross complaint is one that is similar to a complaint Cordis has fully investigated in the past; it is automatically non-reportable.  (*See Goldberg Decl.* ¶ 6).

[3]  The record does not reflect what a kink/bent complaint is.

4

CASE NO. 09-20920-CIV-ALTONAGA/Brown

2.     Making Reportability Determinations

a.     *Coding the Complaint*

To make a proper reportability determination, the Specialist must first decide whether the complaint involves an adverse event,[4] a product malfunction,[5] or both. (*See id.*).  The Specialist then decides which of the thousands of specific adverse event or malfunction codes apply to the complaint.  (*See Fulwood-Kelley Dep.* 31:18–32:16).  It is critical that the Specialist code the complaint properly because Cordis uses the codes to spot trends.  (*See id.* 32:17–33:8).

To code adverse events, the Specialist uses the Medical Dictionary for Regulatory Activities ("MedDRA"), which contains over 53,000 different codes.  (*See Goldberg Decl.* ¶ 7).  Multiple codes may apply to the complaint, so the Specialist considers the different codes and decides which ones are most appropriate based on her knowledge of how the device is used and the information before her.  (*See Pendas Dep.* 22:6–14, 37:8–20; *Fulwood-Kelley Dep.* 134:2–9).  In short, the Specialist uses her judgment to code the complaint to the best of her ability.  (*See Pendas Dep.* 37:8–20).  If the Specialist is uncertain how to code the complaint, she tries to code everything.  (*See id.* 81:22–24).  Since Specialists use their judgment to code complaints, they may code complaints differently or disagree with each other's determinations.  (*See id.* 22:15–18, 63:25–64:15, 73:3–9, Ex. 47).

---

[4]  Under U.S. regulations, an adverse event includes death or serious illness; and under the international regulations it includes death, serious injury, or serious deterioration in the state of health.  (*See Golberg Decl.* ¶ 6).

[5]  Under U.S. regulations, a malfunction generally occurs when a medical device fails to perform as intended.  (*See Goldberg Decl.* ¶ 6).

CASE NO. 09-20920-CIV-ALTONAGA/Brown

b.      *The Hazards List*

After coding the adverse events, the Specialist uses a guide, Cordis's Hazards List, to confirm her initial coding decisions.  (*See id.* 17:7–17, 80:14–18; *Goldberg Decl.* ¶ 8).  The Hazards List is a proprietary electronic document that defines codes.  (*See Goldberg Dep.* 38:9–15, 52:2–53:10).  The Hazards List, however, does not contain all possible codes: it lists only 674 of the 53,000 adverse event codes in the MedDRA.  (*See Goldberg Decl.* ¶ 8).  Thus, the Specialist must still use her judgment to determine which codes are most appropriate.  (*See id.*).

The Specialist also uses the Hazards List to code product malfunctions.  Although the Hazards List contains approximately 5,500 product malfunction codes (*see id.*), it does not list all possible malfunctions (*see Fulwood-Kelley Dep.* 134:20–135:16).  So the Specialist may need to determine which malfunction codes on the list are closest to the malfunction reported in the complaint.  (*See id.*).  The Specialist uses her judgment and past experience to decide which malfunction codes apply based on the information before her.  (*See Pendas Dep.* 31:12–16; *Goldberg Decl.* ¶ 8; *Goldberg Dep.* 55:17–56:9, 63:3–64:12).

Finally, the Hazards List provides guidance on whether Cordis may ultimately need to report the complaint.  (*Goldberg Decl.* ¶ 8).  The Hazards List, however, does not contain all the necessary information to make a reportability determination.  (*See id.*).  For example, the Specialist must still determine the type of complaint, such as a serious injury or product malfunction.  (*See id.*; *Pendas Dep.* 17:14–17, 60:25–61:11).  In addition, the Hazards List does not help the Specialist determine whether a 10 or 30 day reporting deadline applies under the international regulations.  (*See Fulwood-Kelley Dep.* 146:11–147:7).

CASE NO. 09-20920-CIV-ALTONAGA/Brown

c.      *Reportability Determinations*

After coding the complaint and getting guidance from the Hazards List, the Specialist determines the actual reportability of the complaint.  Regardless of the nature of the source data or the progress of her investigation, the Specialist must make a reportability determination within 10 days of the complaint.[6]  (*See Goldberg Dep.* 101:7–19).

The Specialist uses three decision trees to determine whether the complaint is reportable: one for the FDA regulations, one for international regulations, and one for Japanese regulations.  (*See Pendas Dep.* 62:3–19; *Goldberg Decl.* ¶ 9).  All the decision trees, which are on Cordis's computer system, are proprietary and used only by Johnson & Johnson subsidiaries.  (*See Goldberg Dep.* 36:3–5, 43:1–13).  The decision trees ask the Specialist a series of yes-or-no questions (*see id.* 44:9–11), and, based on how the Specialist answers a question, the decision trees take her to the next question (*see id.* 37:10–18).  In other words, the Specialist may not ignore questions on the decision trees; the system will not let her.  (*See id.* 43:21–44:18).

Cordis created the first decision tree, the Medical Device Report ("MDR") decision tree, based on FDA requirements and its own analysis.  (*See id.* 42:1–25).  The MDR decision tree requires the Specialist to evaluate the complaint and to decide whether the medical device may have caused or contributed to a death, serious injury, or illness.  (*See Fulwood-Kelley Dep.* 53:4–57:17).  It asks:

---

[6] The investigation and conclusion stages are discussed in more detail below.  *See* discussion *infra* Parts I.B.3. and I.B.4.  Since Cordis requires the Specialist to make a reportability determination within 10 days of the complaint, the Specialist may investigate both before and after her initial reportability determination.  (*See Goldberg Dep.* 101:7–19).  Thus, the Specialist may modify her initial coding and reportability determination after further investigation.  (*See id.*).  This approach allows Cordis to err on the side of caution in reporting complaints.  (*See id.*).  In addition, the Specialist determines whether to report a complaint before the conclusion is written.  (*See id.* 103:7–9).

CASE NO. 09-20920-CIV-ALTONAGA/Brown

- Does the information reasonably suggest that the device may have caused or contributed to a death?

- Does the information reasonably suggest that the device may have caused or contributed to a serious injury or illness defined as:

  ○    Life threatening[7]

  ○    Results in permanent[8] impairment of a body function or permanent damage to a body function or

  ○    Necessitates medical or surgical intervention to preclude permanent impairment of a body function or permanent damages to a body structure?

(*Id.* Ex. 3 at CORDIS 1906).  The MDR decision tree also asks:

- Did the device fail[] to meet its performance specifications or otherwise perform as intended[?][9]

(*Id.* Ex. 3 at CORDIS 1907).  If the Specialist answer all these questions "no," the complaint is not

reportable.  (*See Goldberg Decl.* ¶ 10).  But if the Specialist answers "yes" to any of these questions,

the complaint is reportable.  (*See id.*).

The international Medical Device Vigilance ("MDV") decision tree asks comparable

questions, except the MDV decision tree sometimes exempts complaints that otherwise would be

reportable.  (*See id.* ¶ 11; *Fulwood-Kelley Dep.* Ex. 4 at CORDIS 1924).  If the complaint is

---

[7]  The MDR decision tree defines "life threatening" as "injuries that require professional medical attention and could reasonably, as a practical matter, be expected to result in death in a significant portion of cases if left untreated."  (*Fulwood-Kelley Dep.* Ex. 3 at CORDIS 1906–07).

[8]  The MDR decision tree defines "permanent" as "irreversible impairment or damage to a body structure or function, excluding trivial impairment or damage."  (*Fulwood-Kelley Dep.* Ex. 3 at CORDIS 1907).

[9]  The MDR decision tree notes "[p]erformance specifications include all claims made in the labeling for the device" and "[t]he intended performance of a device refers to the intended use for which the device is labeled or marketed."  (*Fulwood-Kelley Dep.* Ex. 3 at CORDIS 1907).

8

CASE NO. 09-20920-CIV-ALTONAGA/Brown

reportable, Cordis must report the event to the European authorities within 10 or 30 days, depending on the type of event.  (*See Goldberg Dep.* 49:4–50:6).  The MDV decision tree defines the events, such as serious injury[10] or malfunction,[11] and specifies whether the event has a 10 or 30 day reporting deadline.  (*See Fulwood-Kelley Dep.* Ex. 4 at CORDIS 1926–27).

These reporting decisions are not easy.  (*See Pendas Dep.* 79:10–14).  Although Specialists receive guidance from the Hazards List, Specialists may answer decision tree questions differently and arrive at different reportability determinations because of their different interpretations and evaluations of the information before them.  (*See id.* 49:22–50:5, 58:4–60:24, 69:2–21).  Specialists also sometimes ask their colleagues and superiors for their judgment on whether a complaint is reportable.  (*See id.* 76:9–78:4; *Goldberg Decl.* ¶ 12).  If Specialists are still uncertain whether the complaint is reportable, they generally have a bias to report.  (*See Pendas Dep.* 79:20–22).

d.    *Justifications for Non-Reportable Complaints*

If the Specialist determines the complaint is not reportable, she must decide which of several

---

[10]  The MDV decision tree defines "serious injury" as:

- Life threatening, even if temporary in nature,
- Permanent impairment of a body function,
- Permanent damage to a body structure, or
- Necessitates medical or surgical intervention to preclude permanent impairment of a body function or permanent damage to a body structure.

(*Fulwood-Kelley Dep.* Ex. 4 at CORDIS 1926).

[11]  The MDV decision tree defines "malfunction" as:

- Failure of a device to perform when used in accordance with its intended purpose when used in accordance with manufacturer's instructions,
- Inadequate design or manufacture; or
- Inadequacy in labeling or instructions (including those that cause misuse).

(*Fulwood-Kelley Dep.* Ex. 4 at CORDIS 1926).

justifications applies.  (*See id.* 50:18–51:7; *Goldberg Decl.* ¶ 13).  The 24 possible justifications in

the international MDV decision tree include abnormal use and user error.  (*See Goldberg Decl.* ¶ 13;

*Fulwood-Kelley Dep.* Ex. 4 at CORDIS 1926).  To determine which justification applies, the

Specialist consults the reasoning in the MDV regulations and determines which reasoning applies.

(*See Pendas Dep.* 51:8–14).  Similarly, the Specialist must choose from 11 justifications under the

U.S. MDR decision tree.  (*See Golberg Decl.* ¶ 13).  Thus, even if the Specialist otherwise properly

completes the decision trees, she might disagree with a colleague about which justification applies.

(*See Pendas Dep.* 52:1–16).

e.    *Similarity Determinations*

While filling out the decision trees, the Specialist also determines whether the device at issue

is similar to another Cordis product.  (*See Fulwood-Kelly Dep.* 143:5–21).  The U.S. MDR decision

tree asks:

- Was the device involved distributed in the U.S. or is the device similar to one distributed in the US?

     **(If product <u>IS</u> similar to one distributed in the U.S. then provide similar device information in justification section)**

(*Id.* Ex. 3 at CORDIS 1906) (emphasis in original).  The international MDV decision tree and the

Japanese decision tree ask comparable questions.  (*See id.* Ex. 4 at CORDIS 1924, Ex. 5 at CORDIS

1928).  The Specialist uses an Excel spreadsheet to help her make similarity determinations.  (*See

id.* 143:5–144:25).  The spreadsheet provides a matrix of choices for similar products (*see id.*), but

it is unclear from the record how the Specialist uses the matrix.  Before Cordis developed the Excel

spreadsheet, similarity determinations were not easy because Specialists did not have readily-

available documentation or similarity definitions.  (*See id.*).  The lack of guidance meant similarity

CASE NO. 09-20920-CIV-ALTONAGA/Brown

determinations varied greatly. (*See Pendas Dep.* 78:17–79:7). Cordis implemented the Excel spreadsheet in December 2006 (*see Fulwood-Kelley Dep.* 143:5–11); the record does not reveal whether it is still difficult for Specialists to make similarity determinations.

*f.* *The Review Process*

The Specialist's coding and reportability determinations are reviewed by a Clinician to further ensure Cordis properly complies with its regulatory obligations. Clinicians are medically trained Complaint Handling Department employees; they must be registered nurses and have worked in the Catheter Lab. (*See Goldberg Dep.* 13:18–22). When the Clinician does not agree with the Specialist's coding and reportability determinations, which occurs often, the Clinician modifies the coding and reportability determinations. (*See Fombu Dep.* 26:13–28:3, 43:16–22; *Pendas Dep.* 56:7–16). Nonetheless, Clinicians change Specialists' reportability determinations less than 1% of the time; and they change coding determinations only slightly more frequently.[12] (*See Goldberg Decl.* ¶ 12). Moreover, most of the code changes either (1) add information to a correctly selected but incomplete code or (2) make a correct code determination more specific so Cordis can better monitor trends. (*See id.*). The review process also helps Cordis know when it needs to train employees so that Cordis can ensure consistency. (*See Goldberg Dep.* 64:4–65:18).

---

[12] Plaintiffs object to this portion of Goldberg's Declaration because it (1) is inconsistent with Plaintiffs' testimony and (2) lacks foundation. (*See* Pl.'s Stmt. Material Facts [D.E. 46] at 2). But Plaintiffs' testimony is not inconsistent with Goldberg's testimony. Even if Clinicians change reportability determinations on a daily basis, they might change only 1% of all reportability determinations, as Goldberg testified. Neither does the statement lack foundation. Goldberg is Cordis's Director of Quality Assurance (*see Goldberg Decl.* ¶ 1), and both his declaration and deposition testimony demonstrate he has a basis for understanding how often Clinicians change Specialists' coding and reportability determinations. Moreover, Plaintiffs do not explain how the statement lacks foundation, cite any contradictory record evidence, or cite any supporting authority.

11

CASE NO. 09-20920-CIV-ALTONAGA/Brown

### 3.   Investigating Complaints

Third, the Specialist investigates the complaint and puts together a narrative story.  (*See Pendas Dep.* 11:19–12:2).  The length and breadth of the investigation depends on the nature of the complaint and the information initially provided.  (*See Goldberg Dep.* 100:20–101:6).  For example, some complaints do not require any investigation.  (*See id.* 101:7–15).  In general, however, the Specialist spends a lot of her time investigating, and it is not easy.  (*See Pendas Dep.* 35:8–14, 44:4–11).  The Specialist determines when and how much to investigate, particularly to clarify conflicting or ambiguous reports (*see id.* 53:18–21, 82:3–83:1), and decides who to contact (*see id.* 45:14–25).  In addition, she refers to the "Device Instructions for Use" to determine whether the device was used properly.  (*See Fulwood-Kelley Dep.* 183:2–18).

Although the Specialist may use a questionnaire during her investigation, a questionnaire applicable to every possible complaint does not exist.  (*See Pendas Dep.* 23:14–21, 86:23–87:4).  Nor do the questionnaires tell the Specialist who to contact.  (*See Fulwood-Kelley Dep.* 101:8–13).  Rather, the questionnaires include lists of general patient and procedural questions.  (*See Goldberg Decl.* ¶ 14).  As a result, most of the time the Specialist determines which questions are relevant and customizes her questions to the complaint.  (*See Pendas Dep.* 23:6–13).  The Specialist records all information she receives from interviewees in Cordis's system, whether or not she believes the interviewee.  (*See Goldberg Dep.* 106:4–23).

### 4.   Writing Complaint Conclusions

For a reportable complaint, a Clinician writes the conclusion based on the investigation.  (*See Pendas Dep.* 91:6–13).  But for a non-reportable complaint, which most are, the Specialist draws a conclusion after examining the data from her investigation.  (*See id.* 25:24–26:2, 91:6–10).  The

CASE NO. 09-20920-CIV-ALTONAGA/Brown

Specialist must draw a conclusion even if she has no information beyond the initial complaint.  (*See Goldberg Dep.* 112:6–18).  The Specialist summarizes the who, what, when, where, and why of the complaint and determines possible contributing factors that made the complaint non-reportable.  (*See Pendas Dep.* 91:23–93:7).  The contributing factors could include, among other things, the patient's medical history, vessel or lesion characteristics, pharmacological factors, procedural factors, and user handling.  (*See id.* 88:5–18, 92:7–25).  The Specialist tries her best to determine what the possible contributing factors were, although it is not always clear.  (*See Fulwood-Kelley Dep.* 110:10–111:9).  And although the Specialist records all information from the investigation in Cordis's system, she alone determines what information is relevant to include in her non-reportable complaint conclusion.  (*See id.* 40:1–6).

When the complaint provides a lot number for the device, Cordis's Failure Analysis Lab ("Lab") reviews the device's history record and attempts to confirm whether the device was manufactured to its specifications.  (*See id.* 128:2–13).  If the Lab did not do an analysis, the Specialist must provide a reason in her conclusion why it did not.  (*See Pendas Dep.* 95:7–21).  For example, the product might have been unavailable or returned in poor condition, or the Lab might not have had the lot number.  (*See id.*).  Finally, when the Lab does no analysis, the Specialist uses her best judgment to determine how the event in the complaint happened based on the evidence before her.  (*See id.* 97:2–21).

### 5.    Post-Conclusion Information

If new information is discovered after the Specialist writes her conclusion, she may change the complaint's reportability designation or the justifications for non-reportability.  (*See Fulwood-Kelley Dep.* 99:15–100:12).  The Specialist also considers whether the new information requires (1)

CASE NO. 09-20920-CIV-ALTONAGA/Brown

adding additional codes to the complaint; (2) updating the complaint conclusion; (3) creating supplemental follow-up reports; (4) requesting updated device history records or product analysis reports; and (5) updating the complaint response. (*See id.* 105:18–107:19).

### C.     Training Specialists

Specialists need specialized training to properly perform their job because it is complex and detail-oriented. (*See id.* 20:24–21:2; *Pendas Dep.* 67:12–15). In fact, the FDA and its foreign equivalents require Cordis to track the training it gives Specialists. (*See Goldberg Dep.* 67:18–21). Fulwood-Kelley, as a Senior Specialist, provided specialized training, taught Specialists how to develop overall complete conclusions for non-reportable files, and worked on creating a more formal training program at Cordis. (*See Fulwood-Kelley Dep.* 17:21–18:18, 21:21–24). Fulwood-Kelley also reviewed other Specialists' work, including their reportability determinations (*see id.* 43:16–44:14); helped create decision trees (*see id.* 171:5–172:1); and performed "gap assessments," for which she reviewed new regulatory guidelines and suggested modifications to Cordis's procedures (*see id.* 184:13–185:23). Fombu also participated in developing training materials. (*See Fombu Dep.* 20:24–21:3; Resumé of Mabel Fombu [D.E. 40] (sealed document)).

## II.  LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The Court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Hayes v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).

14

CASE NO. 09-20920-CIV-ALTONAGA/Brown

### III.  ANALYSIS

The FLSA requires employers to pay overtime to employees who work more than forty hours in a week.  *See* 29 U.S.C. § 207(a)(1).  "[T]he statute was designed to 'aid the unprotected, unorganized, and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage.'"  *Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 625 (11th Cir. 2004) (quoting *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n.18 (1945)).  The statute accordingly exempts from the overtime requirement employees who work in an executive, administrative, or professional capacity, as defined by the Secretary of the Department of Labor.  *See* 29 U.S.C. § 213(a)(1).  Courts narrowly construe the overtime provisions against the employer, who carries the burden of proving the exemption.  *See Hogan*, 361 F.3d at 625.  Cordis argues Plaintiffs, who worked as Specialists, were administrative employees.

An administrative employee is one: (1) paid at least $455 per week; (2) whose primary duty is non-manual work related to management or general business operations; and (3) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.  *See* 29 C.F.R. § 541.200(a).  Plaintiffs concede they meet the first two requirements of the exemption.  (*See* Pls.' Resp. Opp'n Def.'s Mot. Summ. J. ("*Resp.*") [D.E. 45] at 8).  The only question is whether Cordis has met its burden to prove as a matter of law Plaintiffs' "primary duty include[d] the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a)(3).  It has.

### A.      The Exercise of Discretion and Independent Judgment

"In general, the exercise of discretion and independent judgment involves the comparison

15

and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Courts should apply the phrase "discretion and independent judgment" in light of all the facts involved in a particular employment situation. *See* 29 C.F.R. § 541.202(b). The regulations provide a non-exhaustive list of factors to consider, including "whether the employee investigates and resolves matters of significance on behalf of management" and "whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances."[13] *Id.*

An administrative employee should have the "authority to make an independent choice, free from immediate direction or supervision." 29 C.F.R. § 541.202(c). An employee may exercise discretion and independent judgment, however, even if his or her decisions or recommendations are reviewed, revised, or reversed at a higher level. *See id.*; *see also Dymond v. U.S. Postal Serv.*, 670 F.2d 93, 96 (8th Cir. 1982). In other words, the employee's decisions need not "have a finality that goes with unlimited authority and a complete absence of review" — the employee may recommend an action rather than actually take the action. 29 C.F.R. § 541.202(c).

---

[13] The other factors listed in the regulations are:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives . . . .

29 C.F.R. § 541.202(b).

CASE NO. 09-20920-CIV-ALTONAGA/Brown

The employee's exercise of discretion and independent judgment also "must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources" to qualify for the administrative employee exemption.  29 C.F.R. § 541.202(e); *see also* 29 C.F.R. § 541.704 (noting "employees who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances" are not exempt).  But the use of manuals, guidelines, or other procedures to "provide guidance in addressing difficult or novel circumstances" does not preclude the exemption.  29 C.F.R. § 541.704.

For example, insurance claims adjusters generally meet the administrative exemption "if their duties include activities such as interviewing insureds, witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations regarding litigation." 29 C.F.R. § 541.203(a). Accordingly, in *Cheatham v. Allstate Insurance Co.*, the court held insurance claims adjusters exercised discretion and independent judgment as a matter of law — even though they used manuals for guidance — where they determined the steps necessary to complete a coverage investigation, conducted investigations, assigned percentages of fault to parties, negotiated settlements, and recommended whether coverage should be approved or denied.  *See* 465 F.3d 578, 584–86 (5th Cir. 2006); *see also In re Farmers Ins. Exch., Claims Representatives' Overtime Pay Litig.*, 481 F.3d 1119, 1129–32 (9th Cir. 2007) (finding insurance claims adjusters who used damage estimate software and manuals were exempt employees).

Similarly, in *Haywood v. North American Van Lines, Inc.*, the court held the plaintiff met the

17

CASE NO. 09-20920-CIV-ALTONAGA/Brown

administrative exemption as a matter of law because she conducted thorough investigations about cargo damage and billing complaints, including asking the customer a variety of questions and reviewing documents; determined when she had enough information to complete her investigations; and negotiated settlements with customers. *See* 121 F.3d 1066, 1072–73 (7th Cir. 1997). In addition, no two complaint handlers would reach the same settlement on the same facts. *See id.*; *see also Auer v. Robbins*, 65 F.3d 702, 719–21 (8th Cir. 1995) (holding internal affairs officers met the administrative exemption because they determined when to proceed with an investigation and what charges to file, ensuring the department operated in accordance with its goals and policy objectives); *Dymond*, 670 F.2d at 95–96 (holding postal inspectors who determined "when a situation requires immediate action" and "whether an alleged postal violation warrants prosecution or is a minor technical violation" met the administrative exemption).

Here, likewise, Plaintiffs' primary duty — investigating complaints and determining whether they are reportable under federal and international regulations — included the exercise of discretion and independent judgment. Plaintiffs' duties met at least two of the activities described in the regulations: (1) investigating and resolving matters of significance and (2) representing Cordis in handling complaints. Plaintiffs determined when and how much to investigate based on the nature of the complaint, who to interview during the investigation, and when an investigation was complete. They also "owned" the complaints through conclusion; after investigating, Plaintiffs analyzed the facts and made coding and reportability determinations. In addition, for non-reportable complaints, Plaintiffs decided what made the complaint non-reportable, drafted conclusions with information they believed was relevant, and, when there was no failure analysis from the Lab, used their judgment to determine how the event in question happened based on the evidence before them.

18

CASE NO. 09-20920-CIV-ALTONAGA/Brown

Finally, it is undisputed Specialists can reach different coding and reportability conclusions on the same facts because of their different interpretations of the facts. For example, the Hazards List does not list all possible product malfunctions, so Plaintiffs used their best judgment to determine which codes were most applicable. And despite the potential for variation, Clinicians adhere to Specialists' coding and reportabilility decisions approximately 99% of the time. In short, Plaintiffs used their discretion and independent judgment to determine when Cordis needed to report product malfunctions or injuries to regulatory authorities.[14]

Plaintiffs, however, argue they merely applied their skills and knowledge for four reasons: (1) they were like public sector inspectors who are exempt under the regulations; (2) they were like other inspectors courts have found exempt; (3) the regulated nature of the business eliminated their discretion and independent judgment; and (4) Cordis's decision trees, manuals, and guidelines eliminated their discretion and independent judgment. None of these arguments is persuasive.

First, Plaintiffs argue they were like public sector inspectors who investigate safety, construction, health, or similar code violations. *See* 29 C.F.R. § 541.203(j). Those employees do not meet the "administrative exemption because their work involves the use of skills and technical abilities in gathering factual information, applying known standards or prescribed procedures, determining which procedure to follow, or determining whether prescribed standards or criteria are met." *Id*. The undisputed facts, however, are that Plaintiffs used their best judgment to make

---

[14]  Cordis also argues Plaintiffs exercised discretion and independent judgment because they reviewed new regulations, advised Cordis on modifications to procedures based on new regulations, and trained other Specialists. There is no evidence in the record, however, showing (1) how often Plaintiffs performed these duties or (2) whether Pendas performed any of these duties. Therefore, Cordis has not met its burden to show these activities were part of Plaintiffs' primary duty. *See* 29 C.F.R. § 541.700(a) (defining "primary duty" as "the principal, main, major, or most important duty that the employee performs").

difficult coding and reportability determinations, rather than simply apply known standards or prescribed procedures. Although the decision trees asked yes-or-no questions and Plaintiffs could not ignore the Hazards List, Plaintiffs still determined: (1) which codes were most appropriate; (2) whether the device caused or contributed to a death or serious injury; (3) whether the device was used as intended, its design was inadequate, or its labeling was inadequate; (4) whether an injury was life threatening, caused permanent impairment or damage, or necessitated medical intervention; and (5) whether the complaint involved user error or another non-reportable justification. Although the decision trees and manuals provided loose definitions, they were not "prescribed standards or criteria" similar to the objective criteria a health or safety inspector uses.

Second, Plaintiffs argue they were like the investigators found non-exempt in *Opinion Letter Fair Labor Standards Act*, No. FLSA2005-21, 2005 WL 3308592 (Dep't of Labor Aug. 19, 2005) and *Fenton v. Farmers Insurance Exchange*, No. 07-4861, 2009 WL 3164772 (D. Minn. Sept. 29, 2009). But, unlike Plaintiffs, the employees in *Opinion Letter* and *Fenton* merely investigated and provided factual reports so that other employees could make a decision — they did not analyze the facts and determine what course of action the employer should take. *See Opinion Letter*, 2005 WL 3308592, at *2; *Fenton*, 2009 WL 3164772, at *2, *6–*7).

Third, Plaintiffs argue the regulated nature of the medical device industry inherently fosters conformity and reduces discretion. *See Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 404 (6th Cir. 2004) (noting regulations and procedures "create conformity which has the practical effect of minimizing discretion"). *Schaefer* recognizes, however, the question is not whether the industry is regulated, but whether the individual employee, constrained by regulations, exercises discretion and independent judgment. *See id.* (noting each employee in a regulated industry must be examined

CASE NO. 09-20920-CIV-ALTONAGA/Brown

individually); *see also Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 374–75 (7th Cir. 2005) (finding employees in a heavily regulated industry exercised discretion and independent judgment); *Renfro v. Ind. Mich. Power Co.*, 370 F.3d 512, 518–19 (6th Cir. 2004) (same). As discussed above, Plaintiffs used their discretion and judgment to make coding and reportability determinations and draft complaint conclusions after analyzing the facts of the complaint.

Finally, Plaintiffs argue Cordis's decisions trees, its manuals, and its built in bias to report eliminated Plaintiffs' discretion and independent judgment. The regulations, however, provide that established procedures do not preclude the exemption when the procedures "provide guidance in addressing difficult or novel circumstances." 29 C.F.R. § 541.704. Here, the undisputed facts are that Plaintiffs often made difficult coding and reportability decisions because the decision trees and guidelines did not provide answers in every circumstance. *See Cheatham*, 465 F.3d at 584–86; *In re Farmers Ins. Exch.*, 481 F.3d at 1129–32. *Cf.* 29 C.F.R. § 541.704 (noting employees who use manuals to find the "correct" response to a set of circumstances do not meet the exemption). And even when a Clinician modifies a Specialist's decision, it is generally not because the decision is incorrect, but because the Clinician disagrees with the Specialist's interpretation of the facts. Thus, despite the decision trees and guidelines, Plaintiffs exercised discretion and independent judgment.

In sum, Cordis has proven as a matter of law Plaintiffs, as Specialists, exercised discretion and independent judgment in ensuring Cordis complied with regulatory reporting requirements.

### B.   Matters of Significance

Plaintiffs must also have exercised discretion and independent judgment "with respect to matters of significance." 29 C.F.R. § 541.200. "The term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a). It is undisputed

CASE NO. 09-20920-CIV-ALTONAGA/Brown

Plaintiffs' work was critical to Cordis's business: if Cordis fails to comply with regulatory requirements, it could be subject to negative consequences such as audits, prohibitions on its products, and lawsuits.[15]   Accordingly, Cordis has met its burden to prove as a matter of law Plaintiffs exercised discretion and independent judgment with respect to matters of significance.

## VI.  CONCLUSION

Consistent with the foregoing analysis, it is **ORDERED AND ADJUDGED** as follows:

1. Cordis's Motion **[D.E. 35]** is **GRANTED**.

2. Cordis is granted summary judgment on Count I of the Complaint, the only claim stated.

3. Judgment for Cordis will be entered separately.

4. The Clerk is directed to **CLOSE** this case, and all pending motions are **DENIED** as moot.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 22nd day of December, 2009.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

---

[15]   Plaintiffs claim "there would need to be a complete and systemic flaw in the manner in which [Cordis] processed complaints, not the erroneous acts of an individual employee or two" in order for Cordis to suffer such negative consequences.  (*Resp.* at 17).  Plaintiffs, however, did not provide the Court with the deposition testimony upon which they rely.

22